**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

KAREEM BROWN,                                        )
                                                     )
                                    Plaintiff,       )
                                                     )        **PLAINTIFF'S COMPLAINT**
                         -against-                   )        **AND DEMAND FOR JURY**
                                                     )        **TRIAL (ECF)**
MONTEFIORE MEDICAL CENTER,                           )
                                                     )
                                                     )
                                    Defendant.       )
_____)


Plaintiff, **KAREEM BROWN** (hereinafter "Plaintiff" or "Mr. Brown"), by and through

his attorney, Stacey Gray PC, alleges against **MONTEFIORE MEDICAL CENTER**

(hereinafter "Montefiore") as follows:


## NATURE OF ACTION

1.      Montefiore institutionalized a culture where white subordinates are allowed to

harass, discriminate and retaliate against their supervisor when he is an African American man.

2.      Plaintiff is an African-American man who brings this action against Montefiore

for racial discrimination and retaliation, and for creating a race-based hostile work environment

in violation of 42 U.S.C. § 1981.  Montefiore is also liable for the hostile work environment it

created and maintained because of Mr. Brown's race and gender, as well as for discrimination

and retaliation in violation of the New York State Human Rights Law, Executive Law § 296 _et_

_seq._ ("NYSHRL") and the Administrative Code of the City of New York, §8-101 _et seq._

("NYCHRL") with respect to the terms, conditions and privileges of his employment.

1

3.      At all relevant times, Mr. Brown was the Westchester Square Campus' Chief Technologist in the Radiology Department, and Montefiore refused to adhere to and enforce its policies and procedures when it subjected the plaintiff to a hostile work environment, discrimination and retaliation. Montefiore bears additional liability for allowing Mr. Brown's white male and female subordinates to serve as its proxies to engage in the same unlawful conduct.

4.      Mr. Brown possesses documents and recordings to support his claims against Montefiore.

5.      Mr. Brown was constructively discharged on September 18, 2019 when his health had declined to such a degree that his treating medical professionals advised him that he should not return to work under the circumstances.  By condoning invidious racial and gender discrimination, retaliation and a hostile work environment both among its supervisory staff and subordinates of Mr. Brown, Montefiore had created an intolerable work environment where all reasonable persons would have been compelled to resign.

## JURISDICTION

6.      Plaintiff is a resident of Long Island, New York.

7.      Montefiore Medical Center is a private, non-profit 501(c)(3) located in Bronx, New York.

8.      Jurisdiction also is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4), 42 U.S.C. § 2000e-(5)(f)(3), 29 U.S.C. § 1132(a) et seq., § 1002(3) et seq., § 1104, § 1109 et seq., and § 502 et seq.

9.     The Plaintiff further invokes this Court's pendent jurisdiction, pursuant to 28

U.S.C. § 1367(a), over any and all state law claims and against all parties that are so related to

the claims in this action within the original jurisdiction of this Court in that they form part of the

same case and controversy.

10.    Declaratory, injunctive and equitable relief is sought pursuant to 29 U.S.C. § 621

et seq. and pendent claims.

11.    Plaintiff's claim for declaratory and injunctive relief is authorized by 28 U.S.C.

§§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

12.    Compensatory and punitive damages are sought pursuant to 29 U.S.C. §§ 216 and

217 and the pendent claims.

13.    Costs and attorney's fees may be awarded pursuant to 29 U.S.C. § 621 et seq., and

Rule 54 of the Federal Rules of Civil Procedure.

## VENUE

14.    Venue properly lies in this District under 28 U.S.C. § 1391(a), (b) and (c) and 29

U.S.C. § 621 et seq., this being the District where the Defendant conducts business and the

District where the Plaintiff was employed by the Defendant at all relevant times.

## JURY DEMAND

15.    The Plaintiff demands a trial by jury on each and every one of his claims as pled

herein pursuant to Federal Rules of Civil Procedure 38.

## PARTIES

16.     The Plaintiff, Kareem Brown, is an African-American man within the meaning of the laws against employment discrimination, retaliation and harassment. At all relevant times, Plaintiff held the position of Chief Technologist in the Radiology Department at Montefiore's Westchester Square Campus located in Bronx, New York.

17.     Plaintiff was constructively discharged on September 18, 2019.

18.     The defendant, Montefiore Medical Center, is a private, non-profit 501(c)(3), located at 111 East 210 Street, Bronx, New York, 10467, is an acute care hospital with a voluntary governing board and is the University Hospital for the Albert Einstein College of Medicine with has many campuses, including the Westchester Square Campus. Montefiore is a non-profit organized under the laws and state of New York and is domiciled and conducts business in New York.

## STATEMENT OF FACTS

19.     Mr. Brown is an African-American man who was qualified for all of the positions that he held at Montefiore, and he performed his duties satisfactorily throughout his 17-year tenure at Montefiore.

20.     The problems began in November 2015, when Mr. Brown was promoted to Chief Technologist in the Radiology Department at Montefiore's Westchester Square Campus (hereinafter "Westchester Campus" or "Westchester Square Campus") thereby making him the only African-American man holding that position and ranking.

21.     In that role Mr. Brown supervised approximately twenty-three staff members comprised of X-ray techs, CT techs, Ultrasound techs, clerical staff and tech aides.

22.     Montefiore's management, Human Resources and Labor Relations (hereinafter collectively "Montefiore") discriminated, retaliated and harassed Mr. Brown by intentionally failing to adhere to and enforce Montefiore's policies and procedures which prohibit treating white employees more favorably than Mr. Brown, who is a black man, in violation of various federal, state and city anti-discriminatory, anti-retaliatory and anti-harassment laws. (Ex. 1.)

23.     At all relevant times, Montefiore had been on notice of the overt harassment, discrimination and retaliation experienced by Mr. Brown, but still permitted Mr. Brown's white male and female subordinates, as well as other employees and agents, to harass, discriminate and retaliate against him. These individuals served as Montefiore's proxies for such unlawful conduct. All parties, through individual and joint actions, collectively created an intolerable work environment which resulted in Mr. Brown's constructive discharge. (Id.)

24.     Laima Masone and John O'Donnell were two of Mr. Brown's subordinates who harassed, discriminated and retaliated against him because he is African-American, and Montefiore condoned and perpetuated their unlawful conduct by refusing to apply and enforce its own policies against such wrongdoing.

25.     Ms. Masone is a white woman who held the position of Ultrasound Technologist at all relevant times.

26.     Mr. O'Donnell is a white man who held the position of CT Technologist at all relevant times.

27.     On April 6, 2016, Ms. Masone leaned over Mr. Brown's desk and pointed her finger in his face when she asked in a raised voiced, "Why do I need to tell you everything?"

28.     Ms. Masone asked this question because Mr. Brown spoke to her about failing to follow his instructions when she improperly tried to remove patient images from PACS (Picture Archiving Computer System). (Ex. 3.)

29.     Mr. Brown immediately informed Teresa Mandarino about the incident since she was the Westchester Campus' most senior administrator in charge of daily operations for all of its departments at the time. Her title at all relevant times was Senior Director, Ambulatory Services.

30.     On the same day Mr. Brown, Ms. Mandarino, Ms. Masone and her union delegate, Maurice De Palo, met to discuss the confrontation.

31.     Ms. Masone received a "counseling" for violating Montefiore Human Resources Policy and Procedure, Policy Number VII-1, when she engaged in (1) "[i]nappropriate behavior toward or discourteous treatment of patients, colleagues, visitors, volunteers or any other person"; and (2) was "[u]nsatisfactory" in her "performance of work assignments, negligence or carelessness in performing work assignments"; and (3) was [i]nsubordinat[e] by either refusing to follow a reasonable order or by engaging in rude or disrespectful behavior toward any supervisor." (Ex. 2 at 1, 2, 3.)[1]

32.     After the meeting Ms. Masone and Union Delegate Maurice De Palo (1199) met privately to talk about the situation.

33.     Shortly thereafter, Mr. De Palo informed Mr. Brown that "Laima is a racist" because she told him that she liked Westchester Square Hospital before Montefiore took over, specifically because the prior administration did not hire people who looked like Mr. Brown.

---

[1] All handwritten comments and notes as well as yellow highlights were made by the Plaintiff during the relevant time period. Separately, sections of the policy were highlighted for purposes of this lawsuit.

34.     For context, Montefiore purchased Westchester Square Hospital in 2013, and Mr. De Palo, Ms. Masone and Mr. O'Donnell all worked there prior to the acquisition. The name of the newly acquired hospital became "Montefiore Westchester Square Campus."

35.     Two years after the Montefiore acquisition, Mr. Brown was promoted to Chief Technologist in the Radiology Department for Montefiore Westchester Square Campus and became the immediate supervisor of Ms. Masone and Mr. O'Donnell.

36.     Montefiore institutionalized a culture where white subordinates are allowed to harass, discriminate and retaliate against their supervisor when he is an African American man.

37.     When Union Delegate De Palo informed him of Ms. Masone's bias against having a black supervisor, Mr. Brown responded in sum and substance, "You should take this to your superior because this is not okay with me and you need to do something about it. How can the union allow this knowing they have a member that feels this way and has expressed a racist view to their delegate?"

38.     Union Delegate De Palo said that he couldn't report Ms. Masone's racism because he was her union delegate; however, his statement was inaccurate as he could have reported her.

39.     Mr. De Palo was a full-time employee at Montefiore as a pharmacist and union delegate at all relevant times.

40.     Montefiore did not enforce its "Non-Discrimination and Anti-Harassment (Including Sexual Harassment)" Policy Number: VI-6, when Mr. De Palo failed to report Ms. Masone's racism against her supervisor. (Ex. 1.)

41.     On April 11, 2016, Ms. Masone again violated Montefiore's Human Resources Policy and Procedure, Policy Number VII-1, because of her (1) "[i]nappropriate behavior toward

or discourteous treatment of patients, colleagues, visitors, volunteers or any other person"; and she (2) was "[u]nsatisfactory" in her "performance of work assignments, negligence or carelessness in performing work assignments"; and (3) she was "[i]nsubordinat[e] by either refusing to follow a reasonable order or by engaging in rude or disrespectful behavior toward any supervisor." (Ex. 2 at 1, 2, 3.)

42.     Three weeks later on May 6, 2016, Ms. Masone once more violated Montefiore's Human Resources Policy and Procedure, Policy Number VII-1 when she was insubordinate, rude and disrespectful to Mr. Brown as he tried to review her performance evaluation with her. (Ex. 4.)

43.     Mr. Brown called Ms. Masone to his office to review her performance evaluation, but she asked upon her arrival, "Why do I need to be here for this?"

44.     Mr. Brown attempted to explain the process but she repeated, "I don't need to be here for this...."

45.     Ms. Masone continued that she needed to tell him how to do his job when Mr. Brown reminded her that he was her supervisor. (Exs. 3, 4.)

46.     Mr. Brown then told Ms. Masone that her behavior was rude and disrespectful and needed to stop, and he completed Ms. Masone's evaluation while she sat there totally disengaged instead of participating in the discussion.

47.     Later that day, Mr. Brown emailed Ms. Masone that he needed to meet with her and her union representatives to discuss her insubordination, and they met on May 20.

48.     On May 20, 2016, Mr. Brown met with Ms. Masone and her union representative, Patrick Myrie, to discuss her behavior on May 6, and Ms. Masone received a "Verbal Warning". (Ex. 4.)

49.     On November 28, 2016, Ms. Masone wrongly accused Mr. Brown of not understanding a HIPPA regulation in an email where she also told him to make sure that the alleged mistake did not happen again.

50.     Mr. Brown knew the HIPPA regulations, and explained to Ms. Masone that they had nothing to do with Montefiore's policy that allowed children to remain in the ultrasound room with their parent(s) or custodian.

51.     The next day on November 29, Ms. Masone sent Mr. Brown an email written in all capital letters that she was going to seek legal advice.

52.     In response to Ms. Masone's inappropriate behavior on November 28 and 29, Mr. Brown called Teresa Mandarino, Senior Director, Ambulatory Services, to confirm the Montefiore policy that children are allowed to accompany their parent(s) to the ultrasound room and stay while an ultrasound is being performed.

53.     For the remainder of 2016, Montefiore allowed Ms. Masone to carry on with her plans to sabotage Mr. Brown's ability to fulfill his duties because she did not want a black supervisor.

54.     Montefiore, in fact, permitted Ms. Masone to escalate her harassment, discrimination and retaliation towards Mr. Brown in 2017 because Montefiore treated white men and white women employees more favorably than black male employees.

55.     On April 25, 2017, Ms. Masone ignored Mr. Brown's request that she adhere to Montefiore's policy that an employee who has not received a flu shot wear a face mask when coming into contact with patients. (Ex. 5.)

56.     After Ms. Masone returned to the department later that day, Mr. Brown gave her the written policy about wearing a mask and also told her that she had been unprofessional towards him earlier that day about this issue.

57.     She sent an unprofessional email in response to Mr. Brown's effort to enforce Montefiore's policies for patient safety and to be respected as her supervisor.

58.     Mr. Brown complained again about Ms. Masone's outrageous behavior which violated Montefiore policy number VII-1, and he and Ms. Masone met on April 27, 2017 with 1199 union reps Gladys Wrenick and Montefiore's Teresa Mandarino. (Exs. 2, 5.)

59.     On June 26, 2017, Ms. Masone called Mr. Brown, in part, to have him sign a prepared statement that she had written.

60.     Since Mr. Brown feared that Ms. Masone would make false allegations against him because of the hostility she had previously exhibited towards him because of his race, Mr. Brown asked one of Montefiore's security managers, Mike Parisi, if he would accompany him to witness his interaction with Ms. Masone.

61.     The security manager, Mike Parisi, agreed to be his witness.

62.     Mr. Brown called Ms. Masone to his office, and she arrived with an Emergency Department patient care tech who came to be her witness.

63.     Ms. Masone's written statement referenced the "counseling" that she received for violating Montefiore's policy on May 31, 2017, and another incident involving her treatment of a patient and that patient's child.

64.     Mr. Brown refused to sign Ms. Masone's prepared statement despite her request.

65.     Ms. Masone remained relentless in her refusal to follow Mr. Brown's direction as her supervisor, and approximately two weeks later on July 10, 2017, Mr. Brown emailed Ms. Masone about her failure to follow his instructions yet again. (Ex. 6.)

66.     On August 17, 2017, it became clear to Mr. Brown that Montefiore and the union both knew about Ms. Masone's racism towards him when he attended a meeting about another employee.  The following were in attendance: Melanie Danisi (Radiology Administrator), Estella Vazquez (VP of Union), Todd Austin (Labor Relations Manager), Patrick Myrie (Union Organizer), Maurice De Palo (Union Delegate) and Arthur Robinson (X-Ray Tech).

67.     When Mr. Brown introduced himself to Ms. Vazquez, she said, "Oh, this is the Mr. Kareem Brown", and she and the others began to laugh.

68.     Ms. Danisi then told Ms. Vazquez and the others that their laugher was inappropriate, and Ms. Vazquez apologized.

69.     When the grievance meeting ended, Ms. Vazquez told Mr. Brown that the hostility and insubordination he was experiencing from Ms. Masone were rooted in her antipathy to being supervised by a black man or person of color for the first time.

70.     Later that evening Ms. Danisi called Mr. Brown because the union organizer, Patrick Myrie, told her that Ms. Masone has alleged that Mr. Brown was trying to intimidate her with his size and that she had been in a physically abusive relationship before, albeit not with Mr. Brown.

71.     Ms. Danisi told Mr. Brown to "be careful with this tech because [Ms. Masone] is making wild allegations about you."

72.     Ms. Danisi also asked Mr. Brown what Ms. Vazquez said to him after the grievance meeting earlier that day, and Mr. Brown shared that Ms. Vazquez told him that his

problems with Ms. Masone were directly related to him being an African-American with a supervisory role over Ms. Masone.

73.     Ms. Danisi then advised Mr. Brown to inform Montefiore's Labor Relations about Ms. Masone's problem with having a black supervisor.

74.     The next day, on August 18, 2017, Mr. Brown spoke with Labor Relation's Todd Austin about what Mr. De Palo and Ms. Vazquez separately said about Ms. Masone's racism towards him as her supervisor. Mr. Austin responded that he doubted that the union would come forward and admit to any of this because of its representation of Ms. Masone.

75.     Mr. Brown requested that Mr. Austin document their discussion but he initially refused.

76.     Mr. Brown then called Ms. Danisi to relay the conversation that he had with Mr. Austin, including that Mr. Austin refused to document their discussion.

77.     On information and belief, Ms. Danisi spoke with Montefiore's Mr. Austin of Labor Relations about his initial refusal, because he later emailed Mr. Brown requesting details about the discrimination and stated that he would address it with the union 1199SEIU. (Ex. 7.)

78.     Mr. Brown wrote to Mr. Austin about Ms. Masone's racism. (Ex. 8 at 2, 3.)

79.     Four months after-the-fact, Ms. Masone submitted a "Rebuttal letter" on September 12, 2017, accusing Mr. Brown of fabricating his counseling letter dated June 6, 2017.

80.     On September 27, 2017, the union sought to schedule a time to meet with Mr. Brown to address the ongoing issues and concerns between him and Ms. Masone, and two weeks later on October 11, Mr. Brown, Ms. Masone and the union met.

81.     After the meeting on October 11, Mr. Brown filed a memo dated October 13 which documented Ms. Masone's wrongdoing and reiterated that she was to follow the chain of command. (Ex. 9.)

82.     Throughout the month of October, Mr. Brown corresponded with Montefiore because Ms. Masone was not following the defendant's policies and procedures.

83.     On October 30, 2017, Mr. Brown learned that Ms. Masone had lodged false allegations against him and that those accusations would be investigated by the union.

84.     Ms. Masone falsely accused Mr. Brown of yelling and screaming at her, and stated that other staff members has witnessed the behavior. These false allegations were part of Ms. Mason's concerted efforts to continue her discrimination, retaliation and harassment of Mr. Brown.

85.     On November 15, nearly two months after Mr. Brown wrote about Ms. Masone's race-based hostility towards him on August 17 and August 18, 2017, he followed up with Labor Relations because he had not received any type of response. (Ex. 8 at 1, 2.)

86.     Mr. Austin from Labor Relations responded, "No, we have not received a response. At this point I do not expect one. Is there a current concern that you have?"

87.     Mr. Brown replied, "My concern is trying to manage someone who is known to harbor these feelings present a challenge for me – with that said, I don't know if there is anything I can do as their manager to maintain a productive working relationship and environment…how do you mediate racial bias?..." (Ex. 8 at 1.)

88.     Mr. Austin's email correspondence clearly demonstrated that Montefiore treated Ms. Masone, a white woman, more favorably than Mr. Brown because he is a black man.

89. Specifically, Mr. Brown was left to work in an environment of hostility, discrimination and retaliation as Montefiore refused to adhere to and enforce anti-harassment, anti- discrimination and anti-retaliation policies and procedures that included but were not limited to an appropriate investigation, follow-up and remediation of the situation based on the available options.

90. Montefiore decidedly failed to remedy the situation and instead permitted Ms. Masone to repeatedly be insubordinate and hostile to Mr. Brown because he is a black man.

91. Mr. Brown engaged in protected activity when he informed his direct supervisor, Melanie Danisi, about the situation and included her on the relevant emails, but Montefiore still declined to respond appropriately by taking appropriate and necessary action.

92. Montefiore's unmistakable protection of Ms. Masone helped influence another white employee under Mr. Brown's supervision, John O'Donnell, to target Mr. Brown because he is African-American.

93. Montefiore mischaracterized Ms. Laima Masone and John O'Donnell as simply "problematic employees" when it conducted Mr. Brown's performance evaluation on January 12, 2018 for the period from December 2016 through December 2017.

94. Specifically, the plaintiff's direct supervisor wrote in his performance evaluation of Mr. Brown that he, "manages a low volume site with limited resources which can present challenges. He is a team player in the department and gets on well with his colleagues but does have some problematic employees who can stress him out. I will continue to work with him on the best ways to manage difficult employees with sensitivity." (Emphasis added.)

95.     Montefiore deliberately chose not to name Ms. Masone in Mr. Brown's performance evaluation or to identify her discrimination and harassment of Mr. Brown, despite having ample documentation of her racial animus towards him.

96.     Rather than taking the appropriate and necessary steps to investigate and remediate the hostile environment and discrimination endured by Mr. Brown, Montefiore instead placed the burden on Mr. Brown to "manage" bigoted employees "with sensitivity".

97.     Nevertheless, Mr. Brown continued to engage in protected activity by reporting Ms. Masone's misconduct to Montefiore's management.

98.     On January 18, Ms. Masone attempted to bypass Mr. Brown by seeking approval for a day off from another manager at a different site.

99.     On January 19, 2018, Mr. Brown met with Montefiore's Labor Relations, the union and Ms. Masone to discuss the ongoing problems, and at that meeting, Ms. Masone again made the false allegation that Mr. Brown had yelled and screamed at her and in front of witnesses.

100.    Notably, Ms. Masone was unable to provide any witnesses in support of her allegations

101.    Also, (in the same meeting) Ms. Masone willfully claimed that she was afraid that Mr. Brown would hit her, without offering any reason or rationale to support her alleged fear.

102.    However, Ms. Masone's claims of being in physical fear of Mr. Brown instilled in him a deep-seated and justifiable fear that Ms. Masone would falsely accuse him of unspeakable crimes, without any regard for the harm that her claims would cause to his career, his reputation and his liberty.

103.     At the conclusion of this January 19, 2018 meeting, Ms. Masone was instructed to follow the proper chain of command, which meant obeying Mr. Brown's instructions as her supervisor. (Ex. 10.)

104.     Five days later, on January 24, 2018, Mr. Brown wrote his direct supervisor and the union about Ms. Masone keeping the door to the examining room closed. Mr. Austin recommended that Mr. Brown write Ms. Masone a memo and request that she sign it to confirm her receipt. (Ex. 11.)

105.     Montefiore agreed that Mr. Brown's memo to Ms. Masone should identify its expectations of Ms. Masone: "Follow the chain of command and directives from management"; "keep the exam room door open when patients are not in the room" and "make every effort to see patients who present to Ultrasound with their young child…and seek assistance if the child misbehaves or creates a safety hazard". (Ex. 11.)

106.     Notably, the above expectations squarely contradicted Ms. Masone's previous false claim that Mr. Brown lied about ultrasounds being administered with children present and her inappropriately keeping the door to the ultrasound room closed without a patient present.

107.     Montefiore's Mr. Austin of Labor Relations wrote that, "Ms. Masone acknowledged her understanding and her willingness to comply" with the expectations. (Ex. 11 at 2.)

108.     Mr. Austin also wrote that Ms. Masone violated Montefiore policy VII-1 when she had written to Mr. Brown in capital letters and exclamation points. (Ex. 11at 2 *compare* Ex. 2.)

109.     Fearful and anxious that Ms. Masone would continue to use racial stereotyping and tropes to portray him as the "scary black man" and the "angry black man" to destroy his career at Montefiore, Mr. Brown again sought to have someone witness their interaction.

110.     On or about February 22, 2018, Mr. Brown requested that a member of security be a witness as he asked Ms. Masone for the keys to the exam room.

111.     However, Montefiore chastised Mr. Brown for asking a member of security to witness the interaction. Montefiore's chastisement of Mr. Brown stemmed from its desire to protect itself from further scrutiny. (Ex. 12.)

112.     Ms. Masone dedicated herself to attempting to destroy Mr. Brown's reputation and sabotaging his effectiveness as the Chief Technologist because of his race and gender.

113.     For example, Ms. Masone violated Montefiore policy VII-1 and the chain of command when she disregarded Mr. Brown's instructions in May 2018. This incident involved the Directors of Montefiore's Emergency Department (hereinafter "ED"), specifically, Dr. Anthony Ruvo and Dr. Susan Tinsay. (Exs. 13, 14.)

114.     On May 16, 2018, Mr. Brown corresponded with Michelle Emmons of Montefiore's Human Resources Department and updated her on the history of Ms. Masone's misconduct, all of which stemmed from not wanting a black man as her supervisor.

115.     On May 31, Mr. Brown emailed Ms. Masone, requesting a meeting with her and a union representative in response to the email that she sent Dr. Tinsay previously on May 11.

116.     On June 4, 2018, Mr. Brown emailed himself to document Ms. Masone's insubordination from that morning (Ex. 15) because he knew that she would lie about their interaction as she had done in the past.

117.    And Mr. Brown was right that Ms. Masone would lie. (Ex. 15 *compare time stamps with* Ex. 16.)

118.    Then on June 11, 2018, Ms. Masone failed to show up for the scheduled meeting, and Montefiore approved her "Written Warning". (Ex. 17.)

119.    Montefiore agreed that Ms. Masone's "failure to follow [Mr. Brown's] directives is consistant [sic] and deliberate behavior." (Id.)

120.    Also, Montefiore stipulated that "[c]ontinued violation of Montefiore's policies will result in further disciplinary action up to and including suspension and or termination."  (Id.)

121.    But the day after Ms. Masone received a Written Warning, Montefiore punished Mr. Brown for having engaged in protected activity. Mr. Brown received a call from Ms. Danisi's Assistant Administrator, Aralis Ferreira, who informed him that he had to attend an Emotional Intelligence course.

122.    Ms. Brown responded to Ms. Ferreira that he was being treated as if he was doing something wrong by reporting Ms. Masone's misconduct. He further told Ms. Ferreira that he was receiving conflicting advice from HR and Labor.

123.    On August 17, 2018, Mr. Brown requested that Ms. Masone be suspended in response to her violating policy VII-1 again. (Ex. 18.)  However, Montefiore never took any disciplinary action against her.

124.    On August 23, 2018 Mr. Brown and Ms. Mandarino met with Ms. Masone to discuss her misconduct, and during the conversation she told Mr. Brown, "You're not my father."

125.    Mr. Brown responded in sum and substance, "No, I'm not, I'm your manager and your inappropriate behavior towards me needs to stop."

126.    Ms. Mandarino agreed with Mr. Brown and told Ms. Masone that she needed to show Mr. Brown respect and common courtesy when he was speaking to her and that she was being rude.

127.    A couple of weeks later, Mr. Brown went on vacation and learned upon his return that Ms. Masone used his time away to disrupt his department as documented on September 17, 2018. (Ex. 19.)

128.    Mr. Brown emailed that, "[Ms. Masone's] behavior is creating an uncomfortable work environment for the staff. Sharon and Matthew both expressed that they feel this way and others in the department who have come forward." (Ex. 19 at 1.)

129.    In addition, on September 17, 2018, Sharon Gilmore, who was one of the Mr. Brown's subordinates, wrote to him about the false allegations that Ms. Masone and Mr. O'Donnell made about her and Tech Aide/Service Associate, Matthew Glasheen. (Id. at 3 (marked as page 1 because it's a printed attachment).)

130.    Ms. Gilmore also wrote in that email that Ms. Masone and Mr. O'Donnell speak about Mr. Brown disrespectfully "every chance they get", and Ms. Masone "even says he is not her boss. There is no other stress in our department, everyone gets along fine." (Id.)

131.    Ms. Mandarino, who was the Senior Director, Ambulatory Services, confirmed that the allegations made by Ms. Masone and Mr. O'Donnell against their colleagues were false. (Id. at 1, 2.)

132.    Montefiore, therefore, immediately should have suspended or fired Ms. Masone and Mr. O'Donnell for violating its policies. It chose instead to allow them to harass, discriminate and retaliate against Mr. Brown for being their black male supervisor who reported

their misconduct to HR and the Head Administrator of the Montefiore's Westchester Square
Campus.

133.    Two days later on September 19, 2018, Mr. Brown emailed Ms. Emmons from
Montefiore's Human Resources Department about Ms. Masone and attached various supporting
documents about her misconduct.

134.    He also sought to hold Ms. Masone accountable for violating Montefiore's Policy
VII-1 for her rude and disrespectful behavior toward him during their previous meeting on
August 23, 2018.

135.    On September 26, Mr. Brown emailed Ms. Masone that security had brought to
his attention that she had instructed them to not open the door in the morning, and he told her
that she didn't have such authority.

136.    On October 3, 2018, Mr. Brown both called and emailed Ms. Emmons from HR
as a follow-up to his August request that Montefiore suspend Ms. Masone. However, Montefiore
again failed to take the necessary and proper action to discipline Ms. Masone.

137.    This repeated pattern of inaction by Montefiore demonstrated its institutionalized
racism and sexism against Mr. Brown as an African-American man.

138.    On October 11, 2018, Mr. Brown documented Ms. Masone's refusal to follow his
directive when he wrote that it was her responsibility to inform him directly when the department
was low on supplies for ultrasound, rather than having another person give him the list of items
to reorder.

139.    Ms. Masone retaliated by further harassing and discriminating against Mr. Brown
by complaining to her union, and Mr. Brown received a request to meet on October 31 from

union delegate Mr. De Palo – the same person who initially informed him that Ms. Masone harbored feelings of racial animus and resentment towards him in 2016.

140.    On October 31, 2018, Montefiore persisted in their harassment, discrimination and retaliation against Mr. Brown by having him attend an Emotional Intelligence class.

141.    On November 2, 2018, Mr. Brown emailed Ms. Emmons from HR about his August 2018 request that Ms. Masone be suspended for her continued insubordination.

142.    Ms. Emmons replied in an email that same day that the Labor Relations manager, Georgia Colquhoun-Pryce, wanted to speak with him first.

143.    Before meeting with Ms. Colquhoun-Pryce on November 6, 2018, Mr. Brown met with the Westchester Square Campus' Radiology Administrator and his new direct supervisor, Bradley Clemente.

144.    During that meeting, Mr. Brown engaged in protected activity when he informed Mr. Clemente of the ongoing problems with subordinates Laima Masone and John O'Donnell. He told Mr. Clemente that Ms. Masone had expressed racist views about him to Union Delegate Maurice De Palo, and that union VP Estella Vasquez told him that Ms. Masone was unable to handle having a black supervisor.

145.    Mr. Clemente asked if Labor Relations and HR were aware of Ms. Masone's prejudice, and Mr. Brown responded that he had informed Labor Relations, the Head Administrator of Westchester Square Campus and his former supervisor.

146.    Mr. Clemente requested that Mr. Brown keep him informed on the matter.

147.    Mr. Brown expressed his frustration in dealing with Montefiore and its lack of communication, and that he was still waiting for a response to his request that Ms. Masone be suspended.

21

148.    Mr. Clemente advised Mr. Brown to work with Michelle Emmons who was Montefiore's Business Partner in HR, and Mr. Brown told him that he had been doing his part to work with her and would continue such efforts.

149.    After Mr. Brown's meeting with Mr. Clemente on November 6, he then met with Labor and Employee Relations Manager, Georgia Colquhoun-Pryce. To his surprise, Ms. Colquhoun-Pryce informed him that Montefiore would be investigating him because Ms. Masone accused him of being intimidating, unprofessional and racist towards her.

150.    Ms. Colquhoun-Pryce continued that his subordinate John O'Donnell (another CT scan tech under Mr. Brown's supervision) also had filed a complaint accusing him of reverse discrimination.

151.    Mr. Brown denounced their allegations as false and reminded Ms. Colquhoun-Pryce that Montefiore and the union had been on notice for a lengthy period of time about Ms. Masone's racially-biased views towards black people which had previously been shared by her union delegate Maurice De Palo and the Vice-President of the union Ms. Vazquez.

152.    Nevertheless, Montefiore disregarded its own policies and procedures when it chose not to investigate Mr. Brown's concerns about Ms. Masone and Mr. O'Donnell or to take corrective action.

153.    Ms. Colquhoun-Pryce informed Mr. Brown during their November 6, 2018, any discipline to be imposed on Ms. Masone would be stayed pending Montefiore's investigation of him.

154.    She also instructed Mr. Brown that there could not be any retaliation against Ms. Masone or Mr. O'Donnell for their complaints and that retaliation would not be tolerated.

155.   Montefiore knew that both Ms. Masone and Mr. O'Donnell had made their complaints against Mr. Brown in bad faith.

156.   Mr. Brown expressed his concerned that he already had been walking on egg shells, so to speak, and that anything he did or said could be perceived as retaliatory. He also asked how was he expected to manage Ms. Masone and Mr. O'Donnell, and Ms. Colquhoun-Pryce told him to continue what he has been doing and not to change anything.

157.   On Nov 7, 2018, Mr. Brown emailed Ms. Colquhoun-Pryce with the contact list for the radiology department staff (as an attachment) and he indicated which staff members were white at Ms. Colquhoun-Pryce's request.

158.   Almost half of his subordinates were white at all relevant times.

159.   Mr. Brown also forwarded to Ms. Colquhoun-Pryce the request from union delegate Mr. De Palo to meet with him and Ms. Masone about current issues in the workplace.

160.   On Dec 27, 2018, Mr. Brown emailed Ms. Colquhoun-Pryce and carbon-copied his direct supervisor to discuss Ms. Masone's "continued unacceptable behavior", and wrote that he tried contacting her a couple of weeks before about a separate incident of insubordination in violation of policy VII-1.

161.   Specifically, Ms. Masone said, "Oh my God" and abruptly walked out of Mr. Brown's office when he spoke to her about the Weekly JC Survey Tool.

162.   On January 1, 2019, Mr. Brown complained again about Ms. Masone's behavior to his direct supervisor, Mr. Clemente, who emailed HR's Ms. Emmons about Ms. Masone:

> Georgia [Colquhoun-Pryce] has been working on something with this employee as there have been many issues. However, this has been lingering and continues to decorate and create issues throughout the department at Westchester Sq. Are you available to discuss with me and Kareem? Perhaps you can help us address these issues and get some resolution. Kareem or I can send the other issues for background.

163.     On January 3, Mr. Brown met with HR's Emmons to discuss Ms. Masone and he spoke to her about Ms. Masone's bigotry towards him.

164.     During that meeting, HR's Emmons intentionally failed to document accurately in Ms. Masone's performance evaluation her ongoing misconduct that took place in violation of Montefiore's policies. For example, Ms. Emmons wrote that she'd "like to see [Ms. Masone] show improvement in building her ability to work with others as it relates to meeting departmental expectations" – a statement that failed to identify or address Ms. Masone's long-standing, egregious and unlawful behavior towards Mr. Brown.

165.     Ms. Emmons purposely excluded Ms. Masone's racist and sexist views and behavior toward Mr. Brown in Ms. Mason's evaluation.

166.     Nonetheless, Mr. Brown remained vigilant when he emailed Ms. Colquhoun-Pryce and his supervisor on January 11 to inquire about the next "level of discipline to issue at this point" in light of Ms. Masone's past actions and the most recent ones.

167.     Mr. Brown recommended that Ms. Masone be terminated and submitted the necessary paperwork which documented her misconduct.

168.     But, on Jan 16, 2019, Mr. Brown received a call from Ms. Colquhoun-Pryce in Labor Relations to inform him that Ms. Masone would receive a one-day suspension for her most recent misconduct since the meeting with her in November 2018. (Ex. 20.)

169.     Ms. Colquhoun-Price explained to Mr. Brown that this one-day suspension was only for Ms. Mason's most recent incidents but not for original suspension request made in September 2018 for her misconduct towards him.

170.     Ms. Colquhoun-Pryce also said that Ms. Masone could not be disciplined twice because it wouldn't be fair to her.

171.   Montefiore does not have a policy that prohibits an employee from being suspended more than once during any time period.

172.   Mr. Brown expressed his disappointment and frustration because there is no policy preventing Montefiore from suspending Ms. Masone twice.

173.   On the same day, on January 16, 2019, Mr. Brown emailed Ms. Emmons from Human Resources requesting a date and time to meet to finalize Ms. Masone's one-day suspension.

174.   Mr. Brown also informed Ms. Emmons that Ms. Masone would begin her vacation on January 18 and return on February 4.

175.   Mr. Brown shared Ms. Masone's vacation schedule with Ms. Emmons from HR in an effort to avoid another opportunity for Montefiore to delay the suspension and create another false reason not to impose it.

176.   On January 23, 2019. Mr. Brown and Ms. Emmons from HR were scheduled to meet with Ms. Masone and her union delegate but Ms. Masone and her delegate failed to appear for their 11 am appointment.

177.   Therefore, Mr. Brown and HR's Emmons discussed Ms. Masone's performance evaluation, and Mr. Brown later informed Ms. Masone that she must attend an effective communication class which was memorialized in a subsequent email that day.

178.   After her annual performance evaluation, Ms. Masone falsely accused Mr. Brown of harassing her, and she claimed that her colleagues harassed her too.

179.   Ms. Masone's one-day suspension did not occur until February 21, 2019.

180.    On February 22, 2019, HR's Emmons told Mr. Brown that his staff shared that Ms. Masone had created the problems in the department and that they all work well together except for Ms. Masone and John O'Donnell.

181.    Ms. Emmons also stated that the staff believed that Ms. Masone was racist toward Mr. Brown.

182.    On March 5, 2019, Mr. Brown asked Ms. Emmons for the status of any investigation into Ms. Masone and Mr. O'Donnell's allegations against him for reverse racism, but she did not have an answer.

183.    Ms. Emmons later admitted on tape that Montefiore had failed to conduct an investigation.

184.    Mr. Brown's efforts to be treated fairly by Montefiore as a black man remained futile.

185.    On March 12, 2019, Ms. Masone was insubordinate again when she refused to discuss teamwork with Mr. Brown when they met.

186.    A week later, on March 20, 2019, Montefiore's Teresa Mandarino documented that "Ms. Masone has been counseled and disciplined on several policy violations ranging from deviation from Montefiore policies, failure to follow chain of command and behavioral issues." (Ex. 21.)  She also wrote that Ms. Masone has mistreated Mr. Brown repeatedly and that, "[s]everal of the associates have voiced their concern and objection to Ms. Masone's behavior to me, especially when she references Mr. Brown." (Id.)

187.    On March 23, 2019, Mr. Brown engaged in protected activity again when he summarized to Mr. Clemente the discrimination, retaliation and harassment that he had endured while being the Chief Technologist. (Ex. 22.)

26

188.    On March 25, 2019, Mr. Brown and Mr. Clemente discussed his March 23rd email (Ex. 22) and that Mr. Brown should recuse himself from investigating the complaints made by his subordinates John O'Donnell and Matthew Glasheen against each other.

189.    Also, on March 25, union delegate Mr. De Palo informed Mr. Brown that he told 1199 Union Organizer, Pansey Saa Llewellyn, that he did not intend to represent Ms. Masone any further because of her racism.

190.    On March 27, Mr. Brown forwarded Ms. Mandarino's March 20th correspondence to his supervisor, Mr. Clemente,

191.    Also, on March 27, Ms. Mandarino visited Mr. Brown's office because Union Delegate De Palo told her that he would not represent Ms. Masone anymore because she was racist and that Ms. Llewellyn told him to stop communicating with Montefiore's management.

192.    On March 29, Mr. Brown tape recorded his conversation with Union Delegate Maurice De Palo.

193.    On that March 29 tape recording, Union Delegate Maurice De Palo admitted that Ms. Masone was racist towards Mr. Brown, but that he wasn't able to do anything about it because of his union duties.

194.    Nonetheless, Mr. De Palo told Mr. Brown on tape that, "See I would tell Michelle [Emmons] exactly everything, but I'm afraid…"

195.    Mr. Brown responded on tape, "But if somebody [was] discriminating against you, how would feel?"

196.    Mr. De Palo answered, "I would feel like you" and followed up with "I'll say that you are not racist".

197.    On April 2, 2019, Mr. Brown emailed Montefiore's HR and carbon-copied his supervisor when he inquired about the status of any investigation(s) about Ms. Masone and Mr. O'Donnell's false allegations of reverse racism against him.

198.    Mr. Brown tape recorded his April 9th conversation with Ms. Emmons of HR who disclosed that Ms. Masone "has a plot against you, she just wants you gone."

199.    Ms. Emmons also stated on that April 9th recording that John O'Donnell has apologized for his behavior towards Mr. Brown.

200.    On April 11, 2019, the union delegate Mr. De Palo admitted on tape that everyone including the union knows that Ms. Masone has been the one causing the problems.

201.    On April 12, 2019, Mr. Brown engaged in protected activity again when he emailed Ms. Emmons and his direct supervisor about the unlawful behavior. (Ex. 23.)

202.    On April 29, Mr. Brown taped recorded his conversation with HR's Emmons and his supervisor, Mr. Clemente, who was the head administrator of the Radiology Department of the Westchester Square Campus.

203.    Montefiore HR's Director, Michelle Emmons, admitted on that same tape that Montefiore had failed to conduct a proper investigation regarding John O'Donnell's allegations against Mr. Brown as well.

204.    Ms. Emmons previously stated on the April 9th tape that John O'Donnell had apologized for his behavior towards Mr. Brown and that Montefiore found his apology to be acceptable.

205.    However, Montefiore should have disciplined Mr. O'Donnell for the unconscionable and false allegation that Mr. Brown was engaging in racial discrimination against him.

206.    Instead, Montefiore wanted Mr. Brown to simply accept Mr. O'Donnell's apology.

207.    Also, on that April 29th recording Ms. Emmons stated that Montefiore had failed to conduct an investigation regarding his allegations against Ms. Masone.

208.    HR's Emmons said as well on that April 29th recording:

Kareem, let me tell you something. I have supervised staff (laughs), terrible staff in my past. I know it's not an easy job. But you have to know how to deal, deal with difficult people…You're not always going to have great staff. You're going to have some people who are difficult and you have to know how to deal with them.

209.    Ms. Emmons then instructed Mr. Brown to stop reporting and complaining about Ms. Masone's unlawful behavior — which consistently violated Montefiore's policies – because it was Montefiore's expectation that he just accepts it as being part of job.

210.    Mr. Brown responded that Ms. Masone was more than "difficult" and told HR's Emmons, "You know there's more that's involved in this particular employee" on tape.

211.    And Ms. Emmons admitted this truth on tape when she answered, "We understand that we do."

212.    In sum, Montefiore told Mr. Brown on tape that he had to accept discrimination, retaliation and harassment as being part of the job, and that it was futile for him to complain about it or engage in protected activity.

213.    Mr. Brown's health had been steadily declining but it plummeted after his April discussions with Montefiore that were recorded.

214.    Ms. Masone and Mr. O'Donnell continued to mistreat Mr. Brown, but he stopped complaining to management because it was futile.

215.    Montefiore's unlawful conduct towards Mr. Brown influenced others to abuse him, specifically, Union Delegate De Palo noted that Mr. O'Donnell was negatively influencing fellow subordinate Bohong Francis Wen.

216.    For example, Mr. Wen did not follow Mr. Brown's directives and spoke to him inappropriately.  Mr. Wen also violated Montefiore's policies when he was found sleeping on the job, bringing beverages into the CAT scan room and playing videos games while on duty.

217.    On June 19, the head administrator of Westchester Campus similarly noted that Mr. O'Donnell appeared to be influencing Mr. Wen when she issued him a Written Warning for his misconduct.

218.    At a subsequent grievance meeting on July 3, 2019, the union allowed Mr. Wen to be unprofessional towards Mr. Brown.

219.    Mr. Brown went on vacation from July 3 through July 14, 2019 and returned to work on July 15.

220.    On July 16, Mr. Brown left work and went to Urgent Care because he was experiencing chest pains.

221.    On July 17, 2019, Mr. Brown took a sick day.

222.    On July 26, 2019, Mr. Brown went on Medical Leave.

223.    On Sept 12, 2019, Dr. Robert L. Goldstein, Clinical Professor of Psychiatry College of Physicians & Surgeons of Columbia, wrote that returning to work would be detrimental to Mr. Brown's health based on the ongoing and systematic mistreatment and racial discrimination perpetrated and condoned by Montefiore's management, HR and Labor Relations. (Ex. 24.)

224.    On September 16, Mr. Brown's attorney wrote to Montefiore's in-house counsel attorney, Ricardo Tapia, because Mr. Brown was scheduled to return to work on September 18. (Ex. 25.)  Specifically, Mr. Brown's attorney sought an update with respect to any and all actions taken by Montefiore in response to Mr. Brown's various complaints, the contents of her letters to the in-house attorney and their discussions about Mr. Brown's allegations.

225.    Previously Mr. Brown's attorney had played for Mr. Tapia relevant portions of the tape recordings from April 2019, identified documents and provided information to support Mr. Brown's allegations against Montefiore, Ms. Masone and Mr. O'Donnell.

226.    However, Mr. Tapia, Montefiore's in-house attorney, reiterated in an email on September 16 that Montefiore had not engaged in any unlawful conduct with respect to Mr. Brown.

227.    Mr. Tapia's response confirmed that Montefiore had kept intact its practice of harassing, discriminating and retaliating against Mr. Brown.

228.    Therefore, Mr. Brown's attorney emailed Mr. Tapia back that Mr. Brown has been constructively discharged.

229.    Mr. Brown's constructive discharge was the final adverse employment action that he suffered because Montefiore had created and maintained an intolerable and hostile work environment where all reasonable persons would be compelled to resign.

230.    Montefiore's harassing, discriminatory and retaliatory treatment of the plaintiff by and through its agents and representatives was willful because they knew or should have known, and or acted recklessly to the fact that their conduct was prohibited by law and would cause such injuries.

231.     As a proximate cause of Montefiore's hostile work environment, discrimination and retaliation, Plaintiff has suffered and continues to suffer substantial losses, including without limitation to his compromised health, the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

232.     As Chief Technologist Mr. Brown received a 3% annual raise and a 5% annual bonus.

233.     As a further and proximate cause of Montefiore's actions, the plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation.

234.     As a further and proximate cause of Montefiore's actions, the plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's emotional and physical health.

235.     Montefiore's conduct was outrageous and malicious, intended to injure the plaintiff and was done with reckless indifference to the plaintiff's protected civil rights, entitling him to an award of punitive and compensatory damages.

236.     All of Montefiore's actions found in this lawsuit herein are the proximate causes of the plaintiff's injuries.

## FIRST CAUSE OF ACTION

### Racial Discrimination Against Defendant under 42 U.S.C. §1981

236.     The plaintiff incorporates by reference the allegations in paragraph 1 through 235 as if fully set forth herein.

237.     The actions of Defendant, by and through its agents and employees, subjected the plaintiff who is an African-American man, to discrimination with respect to the terms, conditions

and privileges of his employment, which was motivated by animus based on the plaintiff's race. Montefiore's discrimination was intentional, malicious and or with reckless disregard for the natural and probable consequences of such unlawful actions, all of which lacked justification, were designed to and did cause specific, punitive and compensatory injury in violation of the plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

238.    Mr. Brown suffered the final adverse employment action when he was constructively discharged because Montefiore created an intolerable work environment where all reasonable persons would have been compelled to resign.


## SECOND CAUSE OF ACTION

**Hostile Work Environment in Violation of 42 U.S.C. § 1981 Against Defendant**

239.    The plaintiff incorporates by reference the allegations in paragraph 1 through 235 as if fully set forth herein.

240.    The actions of Defendant, by and through its agents and employees, subjected the plaintiff who is an African-American man to a hostile work environment because the offending behavior was so severe or pervasive that it created an abusive working environment and that the environment was so intolerable that a reasonable person would have felt compelled to resign.

241.    For these reasons Defendant did cause specific, punitive and compensatory injury in violation of the plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.


## THIRD CAUSE OF ACTION

**Retaliation for Engaging in Protected Activity Against Defendant under 42 U.S.C. §1981**

242.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

243.     Plaintiff made a prima facie showing that (1) he engaged in protected activity when he opposed and complained about the hostile work environment, discrimination and retaliation; (2) Montefiore was aware of such activity; (3) the plaintiff suffered an adverse employment action based on that activity, and (4) there is a causal connection between the protected activity and the adverse action.

244.     The actions of the defendant, by and through its agents and employees, subjected the plaintiff who is an African-American man, to retaliation with respect to the terms, conditions and privileges of his employment, which was motivated by racial animus based because Plaintiff engaged in protected activity. Montefiore's retaliatory actions were done intentionally, maliciously and or with reckless disregard for the natural and probable consequences of its actions that lacked any justification but were designed to and did cause specific, punitive and compensatory injury in violation of the plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.


**FOURTH CAUSE OF ACTION**

**Race-Based Hostile Work Environment Based under the New York Human Rights Law § 296 Against Defendant**

245.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

246.     The actions of the defendant, by and through its agents and employees, subjected the plaintiff to a hostile work environment by subjecting him to inferior terms, conditions and privileges of his employment because Mr. Brown is African-American. The plaintiff has suffered

34

injuries as a result and is entitled to damages and other awards from the defendant for violating New York Human Rights Law § 296 et seq.

**FIFTH CAUSE OF ACTION**

**Gender-Based Hostile Work Environment under the New York Human Rights Law § 296 Against Defendant**

247.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

248.     The actions of the defendant, by and through its agents and employees, subjected the plaintiff to a hostile work environment by subjecting him to inferior terms, conditions and privileges of his employment because Mr. Brown is a man. The plaintiff has suffered injuries as a result and is entitled to damages and other awards from the defendant for violating New York Human Rights Law § 296 et seq.

**SIXTH CAUSE OF ACTION**

**Racial Discrimination under the New York Human Rights Law § 296 Against Defendant**

249.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

250.     Defendant, by and through its agents and employees, subjected the plaintiff to discrimination with respect to the terms, conditions and privileges of his employment, which was motivated by animus because Mr. Brown is African-American. Montefiore unlawfully treated Mr. Brown less favorably than white employees because of his race in violation of his rights protected under NYHRL § 296 et seq.

## SEVENTH CAUSE OF ACTION

**Gender Discrimination under the New York Human Rights Law §296 Against Defendant**

251.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

252.    Defendant, by and through its agents and employees, subjected the plaintiff to discrimination with respect to the terms, conditions and privileges of his employment, which was motivated by animus because Mr. Brown is African-American man. Montefiore unlawfully treated Mr. Brown less favorably than white male and female employees because of his gender in violation of his rights protected under NYHRL § 296 et seq.

## EIGHTH CAUSE OF ACTION

**Retaliation for Engaging in Protected Activity under the New York Human Rights Law § 296 Against Defendant**

253.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

254.    Plaintiff made a prima facie showing that (1) he engaged in protected activity when he opposed and complained about the hostile work environment, discrimination and retaliation; (2) Montefiore was are of such activity; (3) the plaintiff suffered an adverse employment action based on that activity, and (4) there is a causal connection between the protected activity and the adverse action in violation of NYHRL § 296 et seq.

255.    The plaintiff is entitled to damages for his injuries.

## NINTH CAUSE OF ACTION

**Racial Discrimination under the Administrative Code of the City of New York ("NYCHRL") §8-101 Against Defendant**

256.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

257.     Defendant treated plaintiff less well than its white employees with respect to the terms, conditions and privileges of employment because Mr. Brown is African-American in violation of NYCHRL § 8-101 et seq.

258.     The plaintiff is entitled to damages for his injuries.


**TENTH CLAIM**

**Gender Discrimination under the Administrative Code of the City of New York ("NYCHRL") §8-101 Against Defendant**

259.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

260.     Defendant treated plaintiff less well than its white employees with respect to the terms, conditions and privileges of employment was motivated because Mr. Brown is African-American man in violation of NYCHRL § 8-101 et seq.

261.     The plaintiff is entitled to damages for his injuries.


**ELEVENTH CLAIM**

**Race-Based Hostile Work Environment Based under the Administrative Code of the City of New York, § 8-101 *et seq.*, Against Defendant**

262.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

263.    The actions of the defendant, by and through its agents and employees, subjected the plaintiff to a hostile work environment by subjecting him to inferior terms, conditions and privileges of his employment because Mr. Brown is African-American. The plaintiff has suffered injuries as a result and is entitled to damages and other awards from the defendant under the Administrative Code of the City of New York, § 8-101 <u>et seq.</u>

## TWELVTH CLAIM

**Gender-Based Hostile Work Environment Based under the Administrative Code of the City of New York, § 8-101 *et seq.*, Against Defendant**

264.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

265.    The actions of the defendant, by and through its agents and employees, subjected the plaintiff to a hostile work environment by subjecting him to inferior terms, conditions and privileges of his employment because Mr. Brown is an African-American man. The plaintiff has suffered injuries as a result and is entitled to damages and other awards from the defendant under the Administrative Code of the City of New York, § 8-101 <u>et seq.</u>

## THIRTEENTH CLAIM

**Retaliation for Engaging Protected Activity under the Administrative Code of the City of New York, § 8-101 *et seq.*, Against Defendant**

266.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

267.    The actions of Defendant, by and through its agents and employees, subjected the plaintiff who is an African-American man to retaliation when he complained to Defendant about

the racial and gender discrimination and retaliation that he endured with respect to the terms, conditions and privileges of his employment.  The defendant's discriminatory and retaliatory actions were done intentionally, maliciously and or with reckless disregard for the natural and probable consequences of the defendant's actions absent lawful justification that was designed to and did cause specific, punitive and compensatory injury in violation of the plaintiff's constitutional rights as guaranteed under Section 8-107 of the Administrative Code of the City of New York.

**FOURTEENTH CLAIM**

**Intentional Infliction of Emotional Distress by the Defendant Against the Plaintiff**

262.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

263.    The defendant is liable for intentional infliction of emotional distress because the plaintiff properly pled: (1) Defendant's conduct was extreme and outrageous; (2) Defendant intended to cause severe emotional distress; (3) there was a causal connection between the conduct and the injury; and (4) the Plaintiff has and continues to suffer severe emotional distress.

**FIFTEENTH CLAIM**

**Negligent Infliction of Emotional Distress by the Defendant Against the Plaintiff**

264.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 235 as if fully set forth herein.

265.    The defendant is liable for the negligent infliction of emotional distress plaintiff properly pled that (1) Defendant owed a duty to the plaintiff as its employee; (2) defendant

breached that duty; and (3) a result of that breach, plaintiff has and continues to suffer emotion distress.

**WHEREFORE,** Plaintiff demands judgment against the defendant as follows:

266.    An Order prohibiting Defendant from continuing or maintaining the *de facto* policies, practices and/or custom of harassing, discriminating and retaliating against African-Americans, and in particular, those in supervisory roles;

267.    An award to the plaintiff of his actual damages in an amount to be determined at trial for loss of wages, benefits and promotional opportunities, including an award of front and back pay compensating plaintiff for the loss of salary and benefits;

268.    A declaration that defendant's actions were in violation of federal, state and city anti-discrimination, retaliation and harassment laws;

269.    Prejudgment interest;

270.    An award of punitive damages;

271.    An award of compensatory damages;

272.    Interests on all amounts due;

273.    An award of costs and attorneys' fees to the full extent permitted by law; and

274.    Such other and further relief as this Court may deem just and proper.

Dated:  December 16, 2019
New York, New York

STACEY GRAY PC
By:  Stacey M. Gray

Stacey M. Gray, Esq.
Stacey Gray PC
60 East 42nd Street, Suite 4600

New York, NY 10165
Ph. (212) 227-9163
Fx. (212) 227-8845
sgray@staceygray.com

*Attorney for Plaintiff*